# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:07cr394** |
| | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **FRANK CAPLE,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the court are defendant's evidentiary motions (Docs. 45-48, 52-62),

motion to suppress statements (Doc. 57) and motion to suppress statements

obtained as a result of consensual body wire recording within the defendant's

residence without prior court approval.  (Doc. 80).  Having been fully briefed and a

hearing held on defendant's motion to suppress his statements, the matters are ripe

for disposition.

**Background**

On September 24, 2007, the United States filed a criminal complaint (Doc. 1)

against the defendant, charging him with possession of cocaine base with intent to

distribute in violation of 21 U.S.C. § 841(a)(1).  That same day, Magistrate Judge

Thomas M. Blewitt approved an arrest warrant and search warrant for the

defendant's apartment, which agents executed on September 25, 2007.  (See Docs.

2-3).  On October 2, 2007, a grand jury returned an indictment (Doc. 13) against the

defendant, charging him with four counts of drug-related offenses, including

possession and distribution of cocaine base and marijuana.  The grand jury then returned an eight-count superseding indictment (Doc. 33) on March 18, 2007.  That indictment charged the defendant with conspiracy to possess and distribute more than 50 grams of cocaine base, cocaine and marijuana, possession with intent to deliver cocaine base, use of a building for drug distribution operations, possession of a firearm in furtherance of a drug-trafficking crime and possession of a firearm while being an unlawful user of controlled substances.

Defendant has filed a number of motions related to his case.  A large portion of those motions address discovery issues.  Three of the motions, however, address whether certain evidence collected by investigators in the case should be suppressed.  These motions seek to suppress statements defendant made to police at the time of his arrest, statements collected by the police through consensual use of a body wire recording device, and physical evidence recovered in a search of defendant's residence.  The court conducted a hearing to address defendant's motion to suppress his statements on September 3, 2008.  The court will relate the facts important for the disposition of those motions at the appropriate point in this decision.  At the conclusion of that hearing, the court ordered the parties to file briefs addressing the testimony.  The parties filed those briefs, along with briefs addressing defendants motion to suppress tape-recorded statements, bringing the case to its present posture.

**Discussion**

2

The court will address each of the defendant's motions in turn.

**A. Motion to Suppress Defendant's Statements**

Defendant seeks suppression of the statements he made to law enforcement officers (Doc. 57).  He argues that his statements were not made after a knowing and voluntary waiver of his Miranda rights.  He also contends that the court should suppress defendant's statements even if the wavier was voluntary, because law enforcement agents engaged in coercive behavior that made his statements not truly voluntary.

The Supreme Court has held that the Self-Incrimination Clause of the Fifth Amendment "[bars] the introduction in federal cases of involuntary confessions made in response to custodial interrogation."  Withrow v. Williams, 507 U.S. 680, 688 (1993).  Courts have found that "a statement is involuntary when the suspect's 'will was overborne in such a way as to render his confession the product of coercion.'"  Choi Chi Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).  To determine whether a confession was voluntary, "courts look to the totality of the circumstances."  Withrow, 507 U.S. at 693.  Such "potential circumstances include not only the crucial elements of police coercion," but also "the length of interrogation; its continuity; the defendant's maturity, education, physical condition, and mental health, [and] . . . the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation."  Id. at 693-94 (internal citations omitted).  Defendant points to several circumstances which he argues demonstrate

that his statements were the product of coercion.

On September 3, 2008, the court held a hearing to address defendant's motion to suppress his statement.  The court will describe the evidence collected in that hearing in some detail in order to describe the totality of the circumstances and determine whether defendant's statement was voluntary.  Task Force Officer Timothy Harding testified at the hearing.  (Transcript of Hearing held on September 3, 2008 (hereinafter "T") (Doc. 77) at 14).  A police officer in Scranton, Pennsylvania, Harding has worked for the Federal Bureau of Investigation's Safe Streets Task Force since March 2007.  (Id. at 15).  In that position, he is assigned to investigate "violent crimes, gang-related crimes and drug crimes."  (Id.).  Harding has extensive training in drug investigation and has participated in "hundreds" of such cases.  (Id. at 16).  He has interviewed "countless" drug suspects in the course of those investigations.  (Id.).

Harding participated in the investigation of Defendant Frank Caple.  (Id.).  He applied for the search and arrest warrants signed by Magistrate Judge Thomas M. Blewitt on September 24, 2007.  (Id. at 17).  The warrant gave permission to search the Defendant's residence and curtilage, located in Scranton, Pennsylvania.  (Id. at 17).  Harding and other officers executed this search warrant on September 25, 2007 at 6:13 a.m.  (Id. at 18, 21).  They arrived at defendant's residence, knocked loudly on the door, shouting that they were police and had a search warrant.  (Id. at 23).  When no one answered, officers forced their way into the residence.  (Id.).

4

Officers encountered two people in the apartment.  (Id. at 24).  Harding and another officer went into the home and entered a bedroom, which at first appeared unoccupied.  (Id. at 24).  The two agents then performed a quick search to "clear" the area.  (Id.).  When they opened a closet door, the agents discovered eighteen-year-old Jennifer Mezick hiding inside.  (Id. at 24-25).  They ordered Mezick out of the closet and onto the ground.  (Id. at 25).  Mezick was unclothed, and Harding and his fellow agent called in a female officer, who found clothing for her.  (Id.).  Agents then handcuffed and detained Mezick.  (Id.).

Harding left the bedroom and went to the living room in the front of the house.  (Id.).  There, he encountered two other officers, Special Agent James Glenn and State Police Trooper Mark Keyes.  (Id.).  With Glenn and Keys was Defendant Frank Caple.  (Id.).  Caple was seated on a couch, handcuffed.  (Id.).  Harding testified that he had been in the house perhaps "a minute, a minute and a half" when he came upon defendant.  (Id. at 26).  Caple had been undressed when officers arrived, but that he had been given a pair of "shorts" to wear while seated on the couch.  (Id.).  Defendant probably remained naked and handcuffed on the couch for a minute before an agent provided him with shorts to wear.  (Id. at 47).  Eventually, officers provided him with other clothing.  (Id. at 48).

Officers continued to "clear" the rest of the residence.  (Id. at 27).  Harding informed defendant that the agents had a search warrant and a warrant for his arrest.  (Id.).  Once Harding determined that officers had secured the residence, he

went outside to his vehicle and retrieved a copy of the search warrant and the

arrest warrant.  (Id. at 28).  He showed these documents to defendant.  (Id.).

Harding did not, however, read him the documents.  (Id. at 52).  Instead, he

allowed defendant to examine them.  (Id.).  Defendant did not read the entire

arrest warrant or search warrant affidavit–he would read parts of the

documents, but did not appear to concentrate on them.  (Id.).

Officers took the handcuffs off defendant, and at 6:25 a.m. Harding read

defendant a copy of his standard Miranda rights.  (Id.).  Harding testified that he read

defendant his rights "very slowly and deliberately to make sure" he understood.  (Id.

at 30).   After reading each area of the rights to defendant, he asked him if he

understood that right.  (Id.).  Once defendant had his rights explained to him and he

agreed that he understood those rights, he signed the form in the presence of

Harding and another task force officer.  (Id. at 30-31).  Harding testified that

defendant never invoked his right to remain silent and never requested that an

attorney be present.  (Id. at 31).   Harding also insisted that he had not offered

defendant any inducement to sign the advice-of-right form, and did not offer him any

special treatment in exchange for cooperating with the investigation or providing a

statement.  (Id. at 57).  He did inform defendant that he was charged with a federal

crime.  (Id.).   After defendant had signed the advice of rights form, however, Harding

informed defendant that he could face serious jail time.  (Id. at 57-58).  Harding had

concluded that defendant had become a bit "glib," and did not appear to be taking

6

the charges seriously and warned defendant of the serious jail time he faced.  (Id. at 57-58).

Harding also testified that defendant was sitting on the couch when informed of his rights.  (Id. at 32).  There was not a lot of noise in the house, and no one was searching in the living room where defendant was seated.  (Id.).  Officers were in other rooms inside the house.  (Id.).  Harding reported that defendant "appeared coherent, not to be under the influence of any drugs, alcohol or any other type of medication."  (Id.).  Defendant could answer basic questions and did not seem "overly depressed or sad," and was not "manic."  (Id.).  Instead, "he just seemed like he was very even keeled and aware of what was going on."  (Id.).  Harding saw no evidence that defendant was under the influence of drugs or alcohol at the time of his questioning.  (Id. at 60-61).  Defendant did not complain of discomfort during this period, and Harding denies making any threats to him.  (Id. at 33).  Defendant did, however, frequently yell to Mezick–held by officers in the kitchen of the residence–that he loved her.  (Id. at 39).  Officers eventually made these frequent shouts into a joke, telling defendant that they also loved him. (Id. at 39).  Defendant would respond that he loved them too.  (Id.).  Harding testified that defendant may have had shackles on his legs when he signed the form, but none on his hands.  (Id. at 34).  Harding denied that officers made any promises to defendant to get him to speak.  (Id.). Defendant refused Harding's offer of medical attention at the scene.  (Id. at 33).  Officers allowed defendant to use the bathroom.  (Id.).

7

Defendant made several statements to Harding while in the residence.  (Id. at 34).  He admitted to possession of marijuana in a jacket pocket in a coat in another bedroom of the home.  (Id.).  He also admitted that there were guns in the house, but denied that they were his.  (Id. at 35).  Instead, defendant insisted that a friend, Henry, had dropped the guns off two nights before.  (Id.).  Defendant claimed that Henry lived in the house, but officers never found any evidence corroborating this claim.  (Id.).

After officers completed their search of the defendant's residence and his car, they transported him to the FBI office at the United States Courthouse in Scranton, Pennsylvania.  (Id. at 38).  This transfer occurred two hours after agents first entered defendant's home.  (Id.).  When they arrived at the federal building, agents took defendant to an interview room.  (Id.).  They removed his handcuffs, keeping the shackles on his legs.  (Id.).  Agents allowed defendant to call his father.  (Id.). Harding testified that defendant maintained his calm, reasonable demeanor during this period.  (Id. at 38-39).  Harding did not read defendant his rights again, though he did inform him that he could stop answering questions at any point.  (Id. at 71). Agents asked defendant whether he was comfortable, and provided him with a can of Coca-Cola, which he drank.  (Id. at 40).

While in the interrogation room, agents asked defendant a few more questions.  (Id.).  Harding wanted to know the purpose of the "large amount of stop and go traffic that was observed going to his apartment."  (Id.).  Defendant admitted

8

that many people came through the residence, where "they would meet to do their thing and then leave." (Id.). Defendant also admitted to frequent marijuana use, saying "he had been smoking marijuana since he was 19 years old." (Id.). He smoked it "as often as he could get it." (Id.). Defendant denied, however, that he had ever used crack cocaine, or had any knowledge of it. (Id. at 40-41). Though he admitted to providing marijuana to others–"he said people give him marijuana and he, in turn, gives marijuana to other people"–defendant insisted that he never sold it. (Id. at 41). Defendant refused to provide the names of the people who stopped by his apartment. (Id.).

Defendant also admitted that his fingerprints would appear on the rifles recovered from his apartment. (Id. at 42). When asked about the handgun discovered in the apartment, defendant at first denied knowledge of the gun and then "made the statement that a lot of people have .25 automatics." (Id.). Harding had not revealed the caliber of the handgun he had found. (Id.). Defendant may, however, have had an opportunity to review an inventory of the items seized from his home before this questioning occurred. (Id. at 76). The caliber of the pistol seized was stated on that inventory. (Id.). This interview took place in a room with a table, six or eight chairs, "normal lighting, air conditioned or climate controlled . . . just a basic room that we use for interview purposes." (Id. at 43). Defendant had his legs shackled, but was not handcuffed. (Id.). Agents interviewed defendant for around thirty-five minutes and then concluded he was not being truthful. (Id.). They stopped

the interview at around 10:30 a.m.. (Id. at 43-44).  Harding testified that defendant

never invoked his right to remain silent or to have an attorney present during the four

hours and fifteen minutes he was with agents.  (Id. at 44).

Defendant points to several factors which he contends establish that in the

totality of the circumstances his statements were involuntary.  The court will address

each of these arguments in turn.  First, defendant contends that the background,

experience and conduct of the accused demonstrates that he did not give his

statements voluntarily.  Defendant points out that Agent Harding had long and

extensive experience and training in law enforcement, but that he had little prior

experience with law enforcement and only limited education.  Defendant also insists

that the "tone and content" of his statement demonstrate that he was scared and

naive and did not understand the waiver of rights he signed.

The court disagrees with the defendant that his behavior during the search

and his initial detention indicates that he gave his statement involuntarily.  No

evidence indicates that defendant was particularly scared or felt threatened or that

he did not understand that he had signed a waiver of his rights.  Agent Harding went

through each part of the rights he waived with him, asking defendant if he

understood each of the rights he waived.  The evidence indicates that defendant

maintained a calm demeanor throughout the interrogation, and did not appear

particularly scared or upset at his situation.  Defendant understood his situation and

lucidly agreed to provide a statement.

10

Defendant also argues that the "time and manner" of the search and statement make suppression necessary.  The search came early in the morning, surprising the plaintiff and his girlfriend when they were in bed, apparently unclothed. A large number of officers burst into the apartment, yelling.  Such a situation, defendant contends, would create a climate of confusion and fear and leave him less likely to conclude that he had a choice on whether to speak to the police.  The court disagrees with the defendant on these grounds as well.  While defendant and his girlfriend were surely shocked by police officers' entry into their dwelling, the court notes that every search consists at least in part of officers entering a dwelling and demanding access and information; the mere presence of police under such circumstances does not by itself create a coercive environment.  Indeed, "'mere emotionalism and confusion do not necessarily invalidate' confessions." Miller v. Fenton, 796 F.2d 598, 613 (3d Cir. 1986) (quoting Corn v. Zant, 708 F.2d 549, 567 (11th Cir. 1983).  As such, a court must examine the circumstances more closely to determine whether a coercive environment existed.  Here, testimony indicates that after the initial entry, police behaved in a calm and businesslike manner.  Officers immediately provided defendant's girlfriend with clothing, gave defendant shorts to wear after his initial arrest and eventually provided him with additional clothing.  The defendant's own behavior under the circumstances, which testimony described as calm and rational, even joking with officers, also indicates that defendant did not feel compelled to provide the information he did.

11

The defendant also contends that his statement was drug-induced and thus involuntary.  Such a statement would indeed be suspect, because it might not be product of the defendant's free will.  See United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994) (holding that "[i]n determining whether a confession was voluntary, we must satisfy ourselves that the confession was 'the product of an essentially free and unconstrained choice by its maker,' that it was 'the product of a rational intellect and a free will' and that the appellant's will was not overborne.'") (quoting United States ex rel. Hayward v. Johnson, 508 F.2d , 236 (3d Cir. 1975)).  No testimony in this case, however, indicates that defendant was intoxicated when he spoke with Agent Harding.  He answered questions in a lucid manner, appeared alert and evidently understood the situation and the questions officers asked him.  Defendant points to admissions he made to Agent Harding that he was a frequent marijuana user, smoking the drug whenever he had the opportunity.  He therefore argues that Agent Harding should have asked defendant if he was under the influence of marijuana before obtaining his Miranda waiver and statement.  By failing too do so, defendant argues, Harding violated his Fifth Amendment rights.  The court rejects this argument, since the question here is not whether Agent Harding should have concluded that defendant was intoxicated, but whether "his confession was not the product of rational intellect and free will." Townsend v. Sain, 372 U.S. 293, 307 (1962) (internal quotation marks, citation omitted).  No evidence indicates that intoxication left defendant incapable of exercising his free will in speaking with

police.  Whether Agent Harding sought to determine whether defendant was intoxicated is not relevant to the voluntary nature of defendant's statements.  <u>See,</u> <u>e.g.</u>, <u>Blackburn v. Alabama</u>, 361 U.S. 199, 205 (1960) (finding a confession from a defendant determined to be mentally ill inadmissible, even though the officers who interrogated defendant reported that he had behaved normally during questioning).

The defendant next argues that his statement was the product of improper inducement and misrepresentations by Agent Harding.  Agent Harding informed defendant that he would be charged with a federal crime and faced a long jail sentence.  Harding also told plaintiff that cooperation with law enforcement officials was in his best interest.  "A promise by a law enforcement officer may qualify as coercion."  <u>United States v. Jacobs</u>, 431 F.3d 99, 109 (3d Cir. 2005).  "[T]he voluntariness of a confession does not depend solely upon whether it was made in response to promises.  Instead, we must determine voluntariness by judging the totality of the circumstances."  <u>United States v. Walton</u>, 10 F.3d 1024,1028 (3d Cir. 1993).  "The question of voluntariness ultimately turns on whether the totality of the circumstances indicates that the will of the suspect was overborne by government coercion."  <u>Alston v. Redman</u>, 34 F.3d 1237, 1253 (3d Cir. 1994).  Thus, "a promise–express or implied–is a factor (indeed, a potentially significant one) in the totality of the circumstances inquiry as to whether a statement was voluntary."  <u>Jacobs</u>, 431 F.3d at 109.

The court finds that in the totality of the circumstances defendant's statements

were not coerced by any alleged promise made by Agent Harding or other officers in connection with them.  First, the testimony indicates that Agent Harding did not make any comments about the serious nature of the charges until after defendant had already signed the advice-of-rights form and gave notice that he understood that he had no obligation to speak.  The testimony in the case also indicates that Harding did not offer defendant any inducement prior to signing the form, and did not indicate that the charges would be less if defendant did so and spoke to the police.  Even after Harding informed defendant that he faced serious charges, he did not offer reduced charges as an inducement to induce defendant to speak.  The evidence, therefore, does not indicate that defendant had an initial reluctance to speak which was only overcome by police officers' promise of a lighter sentence in exchange for cooperation.

Finally, defendant contends that the length of his interrogation and the two separate locations where interrogations were held should render his statements inadmissible.[1]  The court finds that the totality of the circumstances indicates that

---

[1]The defendant cites to one unreported case from the Ninth Circuit Court of Appeals to support his position.  The court finds this case inapposite to the situation at hand.  In United States v. Nunez-Felix, the defendant, a border control agent, was accused of assisting drug smugglers in bringing illegal drugs across the border.  United States v. Nunez-Felix, No. 93-50386, 1995 WL 323745, at *10 (9th Cir. May 26, 1995).  He "did not volunteer his inculpatory statements; he recanted and confessed only after the agents had invoked their coercive tactics.  After [defendant's] several denials, the agent altered the interrogation to take on a sharp accusatorial tone.  After the first 30 to 40 minutes of questioning had passed and" defendant answered all of his interrogators' questions, but not in a fashion they liked, "he was suddenly and repeatedly accused of lying."  Id.  Officers then served a search warrant, and six or eight additional agents appeared, "turning what would normally be considered a benign home setting for an interrogation into a police-

neither the length of the interrogation nor the fact that it took place in two separate

locations created a coercive environment that rendered defendant's statement

involuntary.  The testimony indicates that plaintiff remained relaxed and calm

throughout the time he was questioned in custody.  Nothing shows that defendant

made his statements in order to bring an end to an unbearably long interrogation.

Indeed, the testimony indicates that defendant became less truthful as the day

dragged on; Harding ended the interrogation when he concluded that defendant no

longer desired to cooperate.  Likewise, no evidence indicates that the change in

location undermined defendant's understanding of his rights or created a coercive

environment that rendered defendant's statements a product of police pressure.

See, e.g., Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944) (excluding a confession

as coerced when "prosecutors [were] serving in relays to keep a defendant witness

under continuous cross-examination for thirty-six hours without rest or sleep in an

effort to extract a 'voluntary' confession.").

All of the evidence, therefore, indicates that defendant's statements to officers

were a product of his own free will. The totality of the circumstances do not indicate

---

dominated environment."  Id. at *10-11.  In addition to threats of a harsh sentence and
confrontational interrogation techniques, defendant was not advised of his Miranda rights,
the interrogation lasted four hours and "left Nunez-Felix literally shaking."  Id. at *11.  The
situation here is not similar.  No evidence indicates that agents made any threats to
defendant or that their interrogation ever took on a sharp and accusatorial form.  Testimony
also indicates that defendant remained calm and relaxed throughout the interrogation;
indeed, Harding testified that he felt that defendant was not taking his situation seriously
enough.  Though the interrogation may have lasted several hours, the testimony was
interrupted by a transfer from one location to another.

that the defendant's will was overborne to the point where his statements were the product of coercion.  The court will deny the defendant's motion to exclude his statements.

### B.  Suppression of Evidence Seized in Consensual Body-Wire Recording

The defendant also seeks to suppress audio recordings made through a consensual body recording device worn by a cooperating witness (Doc. 80).  The incident in question occurred on June 13, 2007.  The recording of these statements took place in defendant's home, and the government did not obtain any sort of warrant or other judicial approval before making the tapes.  Agents, however, did obtain the permission of the cooperating witness to record the statements.  Defendant insists that such recording violated both federal law and his Fourth Amendment right to be free of unreasonable search and seizure.[2]

Defendant points to the Omnibus Crime Control and Safe Streets Act of 1968 ("the Act"), 18 U.S.C. §§ 2510 et seq., to argue that the warrantless recording of his conversation with the cooperating witness violated federal law.  The purpose of this statute, the Supreme Court has found, "was effectively to prohibit, on the pain of criminal and civil penalties, all interceptions of oral and wire communications, except those specifically provided for in the Act."  United States v. Giordano, 416 U.S. 505, 514 (19).  Moreover, the Act prohibits introduction of evidence obtained in violation of the statute from being "received in evidence in any trial, hearing or other

---

[2]The parties agree that an evidentiary hearing is unnecessary to address this issue.

proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States."  18 U.S.C. § 2515.

If the conversation between the cooperating witness and the defendant was recorded in violation of this statute, then, the court would be compelled to prevent its introduction at trial.  The Act, however, provides a number of exceptions to that rule.  One relevant exception exists in 18 U.S.C. § 2511(2)(c), which provides that "it shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."  18 U.S.C. § 2511(2)(c).  Thus, "[t]he warrantless recording of a conversation with the consent of one of the parties may be admitted into evidence in a federal prosecution, provided the Government introduces clear and convincing evidence of the accuracy of the recording."  United States v. Seibert, 779 F. Supp. 366, 369 (E.D. Pa. 1991).

Thus, under the statute the defendant cannot challenge the introduction of the recording, since all parties agree that it was made with the consent of the confidential informant.  Of course, if the taping violated the Fourth Amendment, the court would be compelled to suppress the evidence even if the taping did not violate the Act.  As a matter of Fourth Amendment law, however, the Constitution "does not protect a party to a conversation who reposes a trust or confidence in an

17

undisclosed government agent or informant." United States v. Mitlo, 714 F.2d 294, 295 (3d Cir. 1983). Further, "[f]or the undisclosed agent to simultaneously record the conversation with an electronic recording device on his person is no violation of the fourth amendment." Id. "[A] person has no legitimate expectation of privacy in conversations with a person who consents to the recording of the conversations." United States v. Lee, 359 F.3d 194, 201 (3d Cir. 2004). "[I]f a person consents to the presence at a meeting of another person who is willing to reveal what occurred, the Fourth Amendment permits the government to obtain and use the best available proof of what the latter person could have testified about." Id. at 200. Thus, "[w]here one party to the conversation consents to the electronic monitoring, the conversation is admissible." Mitlo, 714 F.2d at 295.

Defendant attempts to distinguish these cases by pointing out that the conversation here occurred in plaintiff's home, where he had a heightened expectation of privacy. The defendant in Lee raised a similar argument. In that case, the confidential informant's recording took place in the defendant's hotel suite. Defendant argued that the recording should be suppressed, because it "occurred in [his] hotel room, a place where a person has a heightened expectation of privacy." Lee, 359 F.3d at 200. The Third Circuit Court of Appeals rejected this argument, finding that "[w]hat is significant is not the type of room in which surveillance occurred but [defendant's] action in admitting [the confidential informant] to the room." Id. at 201. The expectation of privacy that defendant had while alone in his

room "vanished" when he invited the informant into the room.  Id.   The court

concludes that the same reasoning applies here: defendant invited the informant into

his home and spoke freely with him.  He did not have an expectation of privacy for

the conversation in that setting and his recorded conversation with the informant is

not protected by the Fourth Amendment.  The informant could testify to the contents

of this conversation in court, and the court will not prevent the government from

supplying the jury an accurate recording of that conversation.

Defendant also points to Pennsylvania case law that holds that the state

constitution and law prevent the introduction of recordings made in a defendant's

home by a confidential informant.  See Commonwealth v. Brion, 652 A.2d 287, 289

(Pa. 1994) (finding that a confidential informant's recording should be suppressed

because "[i]f nowhere else, an individual must feel secure in his ability to hold a

private conversation within the four walls of his home.  For the right to privacy to

mean anything, it must guarantee privacy to an individual in his own home."); 18

PENN. CONS. STAT. § 5704 (establishing procedures for recording conversations

between a suspect and a cooperating witness in the suspect's home);

Commonwealth v. Fetter, 770 A.2d 762, 766 (Pa. Super. Ct. 2001).

Those holdings, however, rely on Article I Section 8 of the Pennsylvania

Constitution, not the Fourth Amendment to the United States Constitution.  The

admissibility of the evidence in this case is governed by federal law, and "[s]o long

as the information was lawfully obtained under federal law and [meets] federal

standards of reasonableness, it is admissible in federal court despite a violation of state law." United States v. Armocida, 515 F.2d 49, 52 (3d Cir. 1975). Further, the court here enforces federal constitutional standards. "Just as a search authorized by state law may be an unreasonable one under [the Fourth] amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one." Cooper v. California, 386 U.S. 58, 61 (1967); see also California v. Greenwood, 486 U.S. 35, 43 (1988) (holding that "[individual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution. We have never intimated, however, that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs."). Whatever Pennsylvania law may provide on this matter, the taping here comported with the requirements of the Fourth Amendment, and the court will deny the motion to suppress the evidence on those grounds.

### C. Suppression of Evidence Seized in Search of Apartment

The defendant seeks suppression of the evidence seized in the search of his apartment (Doc. 58), arguing that the search violated the Fourth Amendment. He contends that this evidence should be suppressed because it was seized though invalid search and arrest warrants. The question for the court is thus whether probable cause existed to issue the warrants.

Agent Harding supplied the affidavit that led to the issuance of the warrants

here at issue.  In that affidavit, Harding related that he was a federally deputized

Task Force Officer with the Federal Bureau of Investigation (FBI) and a sworn law

enforcement officer, holding the rank of Detective Sergeant in the Scranton Police

Department.  (Affidavit, Exh. 1 to Defendant Brief in Support of His Discovery

Motions (Doc. 63) (hereinafter "Affidavit") at ¶ 1).  The affidavit relates that Harding

had been a Task Force member since February 2007, and a Scranton Police Officer

since November 1998.  (Id. at ¶ 2).  During the period of his employment, Harding

participated in the investigation and arrest of more than five hundred drug offenders.

(Id).  Besides training in the police academy, Harding also has specialized training in

drug and undercover investigations.  (Id.).

The affidavit describes the investigation and Harding's involvement in it.  The

FBI, the Pennsylvania State Police (PSP) and the Scranton Police Department

worked together on the matter.  (Id. at ¶ 3).  Harding took part in the investigation,

and swore familiarity "with the facts and circumstances of this investigation" from that

participation and discussions with other involved agents.  (Id.).  The application

alleges that defendant had committed and continued to commit various drug-related

crimes.  (Id.).  Harding avers that the information in the warrant is the result of his

observations, the observations of other agents involved, and information from

cooperating witnesses, police reports and records and recordings.  (Id. at ¶ 4).

Harding contends that the facts related in the warrant establish probable cause that

defendant possessed with intent to distribute cocaine base and provide probable

cause for a search of defendant's residence.  (Id. at ¶ 5).

The affidavit relates information from a cooperating witness ("CW #1"), who provided investigators with information and participated in a controlled purchase of crack cocaine from Caple at his residence.  (Id. at ¶ 6).  CW #1 had been a suspect in the investigation and had agreed to cooperate in exchange for consideration of lesser charges.  (Id.).  CW #1 told investigators about an illegal drug-sales operation in the Scranton, Pennsylvania area that defendant controlled.  (Id.).  CW #1 reported that defendant "usually has a lot" of crack cocaine on hand.  (Id.).  The witness had purchased crack from defendant in the past.  (Id.).  The affidavit reports that the CW #1's information had in the past proved "accurate and reliable" and had been corroborated by interviews with other cooperating witnesses, "photographic identification," record checks and surveillance.  (Id.).

On June 13, 2007, Harding and a Pennsylvania State Police Trooper met with CW #1 and prepared that witness to make a controlled drug buy from the defendant. (Id. at ¶ 7).  The two police officers searched CW #1's vehicle; they found no money or contraband.  (Id.).  CW #1 had contacted defendant earlier in the day to arrange the purchase of crack cocaine.  (Id.).  Defendant was at home, "anticipating the arrival of CW #1."  (Id.).  The officers placed a recording device on CW #1's body and established surveillance around defendant's home.  (Id.).  Officers provided the witness with $290.00 of pre-recorded U.S. currency with which to purchase the drugs and followed CW #1 closely to defendant's residence.  (Id.).   These

22

surveillance officers saw CW #1 enter defendant's home and leave a short time later. (Id.). CW #1 then drove to a pre-arranged meeting place and turned over a plastic bag containing 1 gram of crack cocaine. (Id.). The Trooper field-tested the substance and received a positive result for cocaine. (Id.). Harding listened to the tape from the body recording device worn by CW #1, hearing a male voice declaring that he had crack cocaine, but could only supply powder cocaine if taken to Philadelphia. (Id.). The witness told officers that defendant had supplied the cocaine. (Id.). Defendant used $60 of the money officers had supplied the witness to pay off an old drug debt and provided the witness with $230 worth of cocaine. CW #1 participated in another controlled buy on June 19, 2007. (Id. at ¶ 8). This time, CW #1, after making a recorded telephone call to arrange the purchase, paid $300 for 2.7 grams of cocaine. (Id.). Recordings of the purchase between defendant and the witness revealed defendant discussing money he made selling drugs and using jargon common to drug dealers. (Id.). CW #1 identified defendant from a photograph as the person who sold him drugs. (Id.).

According to the affidavit, on July 31, 2007, Scranton Police responded to a call of threats made by defendant to a fifteen-year-old female. (Id. at ¶ 9). When Scranton Police investigated the incident, they received statements from several juvenile witnesses describing various illegal acts by the defendant. (Id.). Juvenile Witness #1 (JW #1) provided a handwritten statement alleging that defendant provided marijuana and alcohol to JW #1 and several juvenile friends. (Id.). Another

23

witness (JW #2) also submitted a written statement alleging that defendant had provided JW #2 crack and powder cocaine to set up JW #2 as a drug dealer for defendant's business. (Id.). JW #2 also reported that he had seen defendant with firearms in his residence, including both handguns and rifles. (Id.). Juvenile Witness #3 and Juvenile Witness #4 also reported that defendant had supplied them with marijuana and alcohol. (Id.).

The affidavit also relates that on September 6, 2007, Harding met with another cooperating witness (CW #2), who provided investigators with information on defendant's activities and agreed to participate in controlled buys of crack cocaine from defendant. (Id. at ¶ 10). CW #2 cooperated with law enforcement in exchange for financial compensation. (Id). That witness had not been charged with a crime before agreeing to participate. (Id.). CW #2 told officers that defendant operated an illegal drug enterprise in and around Scranton, Pennsylvania. (Id.). The witness reported that defendant sold crack and powder cocaine, heroin and marijuana. (Id.). CW #2 claimed to have seen defendant in possession of around one pound of marijuana inside his home. (Id.). CW #2 had provided accurate and reliable information in the past. (Id.). Officers had corroborated this information through interviews with other witnesses, record checks, surveillance, and "photographic identification." (Id.).

With the assistance of Harding and a State Police trooper, CW #2 made recorded telephone calls to defendant on September 6 and 7, 2007. (Id. at ¶¶ 11-

24

12).   On September 7, 2007, CW #2 also engaged in a controlled buy from the

defendant.  (Id. at ¶ 12).  The witness wore a body recording device.  (Id.).  The

witness provided officers with four small zip-lock bags of crack cocaine purchased

with $50 provided by the officers.  (Id.).  The witness reported to officers that

defendant had supplied these drugs, and that defendant had told CW #2 that he

could sell crack cocaine, powder cocaine and marijuana.  (Id.).  CW #2 positively

identified defendant from a photograph supplied by police as the person who sold

him/her the drugs.  (Id.).  The recording of the conversation made through CW #2's

body wire corroborated the details of the conversation about drug sales the witness

had reported.  (Id.).

        Based on the information provided in this affidavit, the magistrate judge

issued a search warrant and arrest warrant.  The Fourth Amendment to the United

States Constitution provides that "the right of the people to be secure in their

persons, houses, papers and effects, against unreasonable searches and seizures,

shall not be violated."  Central to this right "'stands the right of a man to retreat into

his own home and there be free from unreasonable government intrusion.'"  Kyllo v.

United States, 533 U.S. 27, 31 (2001) (quoting Silverman v. United States, 365 U.S.

505, 511 (1961)).  Thus, "[i]t is a 'basic principle of Fourth Amendment law' that

searches and seizures inside a home without a warrant are presumptively

unreasonable."  Payton v. New York, 445 U.S. 573, 587 (1980).  The question here

is whether the warrants police used to enter plaintiff's home and to arrest him were

valid.

The Fourth Amendment establishes that "'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons to be seized.'" <u>Groh v. Ramirez</u>, 540 U.S. 551, 557 (2004).  "The threshold requirement for issuance of a warrant is probable cause."  <u>United States v. Ritter</u>, 416 F.3d 256, 262 (3d Cir. 2005).  In determining whether probable cause to issue a warrant exists, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  Thus, "a court considering the sufficiency of an agent's affidavit [must] look at the 'totality of the circumstances,'" to determine whether "common sense" dictates issuing a warrant.  <u>Ritter</u>, 416 F.3d at 262.  A court reviewing that determination has a duty "simply to ensure that the magistrate had a "substantial basis for . . . [concluding]" that probable cause existed. <u>Id.</u> at 238-39 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960)).  Defendant contends that some of the evidence on which the affidavit relies was obtained in an unconstitutional manner, and should not be considered.  In that instance, "the inclusion of illegally obtained evidence does not vitiate a search warrant which is otherwise validly issued upon probable cause reflected in the affidavit based on

26

proper sources." <u>United States v. Sterling</u>, 369 F.2d 799, 802 (3d Cir. 1966).

The court finds that the magistrate judge had probable cause to issue the warrant.  The affidavit supporting the warrant request contains detailed information on the defendant's alleged illegal activities.  The affidavit describes the specific circumstances of drug sales allegedly made by the defendant, including the time, date, location, type of drug purchased, and amount of drugs provided.   The affidavit also contains information describing defendant's alleged operation in general, and this information was provided by several witnesses.  Witnesses positively identified the defendant as the source of drugs that they purchased, both by his voice and by a photograph.  Moreover, the affidavit provided the magistrate judge with a means to determine the circumstances and the interests of the witnesses and gave that judge a substantial basis by which to conclude that their testimony was accurate and reliable.  As such, the totality of the circumstances as described in the affidavit reveal that the magistrate judge had a substantial basis to conclude that probable cause for issuing both an arrest and search warrant existed.

Defendant claims in part that an overly suggestive identification procedure used by law enforcement tainted the arrest warrant issued in the case.  Rather than providing the witnesses with a variety of photographs and ensuring that they chose defendant out of that array, officers merely showed the witnesses a picture of defendant and asked if defendant had sold them the drugs.  "A due process violation can result when an identification procedure is so suggestive that it undermines the

27

reliability of the resulting identification." United States v. Lawrence, 349 F.3d 109, 115 (3d Cir. 2003). In the context of a photographic identification, due process is denied "when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who [the] witness should select." Id. Still, in determining whether the circumstances of an identification violated due process, a court must "examine the totality of the circumstances." Id.

The court finds that the identifications provided by the witnesses to the drug sales were not unconstitutionally obtained when the totality of the circumstances are considered. The witnesses who identified the defendant through photographs were persons with whom defendant had prior dealings. Those witnesses were able to telephone the defendant, arrange for a meeting and obtain drugs from him. The recorded conversations between the defendant and the witnesses indicate that they knew each other. The use of a photograph a single photograph to identify defendant served merely as confirmation of other information, not the sole means of identifying defendant. This case is therefore not like cases where courts have found identification procedures unduly suggestive. The witnesses here identified the defendant before they actually saw a picture of him, and never expressed doubt about his identity after seeing a picture. See, e.g., Foster v. California, 394 U.S. 440, 443 (1969) (finding unduly suggestive a lineup procedure where "petitioner stood out from the other two men by the contrast of his height and by the fact that he

28

was wearing a leather jacket similar to that worn by the robber . . . When this did not

lead to positive identification, the police permitted a one-to-one confrontation

between petitioner and witness," which resulted only in a "tentative" identification.").

Moreover, even if these photographic identifications were excluded, the other

information in the warrant, including drug purchases from defendant's home, police

tails on his activity, reports of recorded conversation, and assurances by various

witnesses that defendant engaged in the drug trade establishes sufficient probable

cause to find the warrants valid.

Defendant also insists that the information used to obtain the warrant was

based on impermissible hearsay.  Courts have found that "[a]n affidavit or a

complaint may be validly based on hearsay information."  United States v. Schartner,

426 F.2d 470, 473 (3d Cir. 1970).  A warrant may be based on such information

because "the issue in warrant proceedings is not guilt beyond a reasonable doubt

but probable cause for believing the occurrence of a crime and the secreting of

evidence in specific premises."  United States v. Harris, 403 U.S. 573, 584 (1971).

When an affidavit relies "solely on the hearsay report of an unidentified informant"

the affidavit "must set forth 'some of the underlying circumstances from which the

officer concluded that the informant . . . was 'credible' or his information 'reliable.'"

United States v. Bamberger, 456 F.2d 1119, 1129 (3d Cir. 1972) (quoting Harris, 403

U.S. at 576-581).  Thus, "[t]he task of the issuing magistrate is simply to make a

practical, common-sense decision whether, given all the circumstances set forth in

the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons

supplying hearsay information, there is a fair probability that contraband or evidence

of a crime will be found in a particular place."  Gates, 462 U.S. at 238.

Defendant argues that the totality of the circumstances here indicates that the

magistrate judge should have found the hearsay information in the affidavit

unreliable and refused to issue the warrant.  He points out that the affidavit does not

contain information documenting prior instances where the information provided by

CW #1 proved reliable.  In addition, the government promised CW #1 consideration

for the information that person provided.  The statements of the various juvenile

witnesses also consisted of unverified hearsay.   CW #2 gave information to officers

in exchange for financial consideration, and Harding offered no information about

prior dealings with the witness to support that witness's hearsay allegations.

Because the affidavit contains this unsupported testimony, defendant argues, the

court should find that probable cause was lacking and suppress the evidence

recovered pursuant to it.

The court disagrees.  The warrant application describes the circumstances of

Harding's interaction with all of these witnesses.  While the affidavit may not have

related past contact with these witnesses that established that they were reliable

sources, the affidavit documented that when the cooperating witnesses went to the

defendant's home with money provided by the police to purchase drugs, they

returned with those drugs.  Moreover, the contact between those witnesses and the

defendant were recorded, and those recordings corroborate the contacts that those

witnesses described.  The other facts alleged in the affidavit–such as the drugs

recovered from the witnesses after their visits to the defendant, the statements from

the defendant those witnesses recorded, and the identification of the defendant by

the witness–all provided evidence which supported the veracity and basis of

knowledge of the statements those witnesses made.[3]  The totality of the

circumstances described in the affidavit, then, indicate that the magistrate judge

reasonably relied on the hearsay statements recorded in the application.

 Defendant contends that the information contained in the warrant application

was stale.  The "[a]ge of the information supporting a warrant application is a factor

in determining probable cause."  United States v. Harvey, 2 F.3d 1318, 1322 (3d Cir.

1993).  If the information supporting the warrant is "too old," it becomes stale and

"probable cause may no longer exist."  Id.  Aged information "may have little value in

---

[3]Defendant does not point to a particular hearsay statement in the affidavit that he
contends should lead the court to throw out the warrant.  Instead, he makes a general
argument that the witnesses who provided the information in the warrant were unreliable.
The court notes that the affidavit supporting the warrant did not rely on unsupported
allegations made by a confidential informant, but represented the fruits of a long-standing
investigation and two controlled buys.  The affidavit contained a great deal of evidence to
support the various witnesses' claims that defendant sold drugs from his apartment.  While
an unsupported allegation of illegal behavior might not provide the probable cause
necessary to issue a warrant, that was not the situation here.  See, e.g., Aguilar v. Texas,
378 U.S. 108, 109 (1964) (finding that a warrant application that contained no
corroborating information but simply stated that "'[a]ffiants have received reliable
information from a credible person and do believe that heroin, marijuana, barbituates and
other narcotics and narcotic paraphernalia are being kept at the above described premises
for the purpose of sale and use contrary to the provisions of the law'" lacked probable
cause).

31

showing that contraband or evidence is still likely to be found in the place for which

the warrant is sought." United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997).

The determination of whether the information supporting the affidavit is stale is a

fact-dependent inquiry requiring a court to "examine the nature of the crime and the

type of evidence." Harvey, 2 F.3d at 1322. If "the facts adduced to support probable

cause describe a course or pattern of ongoing and continuous criminality, the

passage of time between the occurrence of the facts set forth in the affidavit and the

submission of the affidavit loses significance." United States v. Urban, 404 F.3d

754, 774 (3d Cir. 2005).

    The court rejects this argument. Officer Harding signed the affidavit for the

warrant on September 24, 2007. Much of the activity described in the warrant did

occur in June and July, 2007. Only one sale of crack cocaine described in the

warrant occurred within even a month of the application, and that sale occurred

almost three weeks before the government sought the warrant. The magistrate

judge could reasonably have concluded, however, that the information in the warrant

indicates that defendant was engaged in criminal activity where evidence of that

activity would remain in the residence after the original crimes occurred. Evidence

that would demonstrate defendant's culpability, like illegal drugs, large amounts of

cash representing the proceeds of drug sales, scales, ledgers, and telephone

records would likely still be available in the residence, meaning the information in the

warrant was not stale. Moreover, the evidence in the warrant indicates that the

defendant was engaged in a continuing criminal enterprise.  The affidavit reports that defendant promised cooperating witnesses that he could provide them with drugs on request in the future.  As such, the information in the affidavit was not stale, and the warrants not improperly issued.

In addition, defendant argues that the warrant itself was overbroad. He contends that the warrant is so broad that it, "[inverts] the warrant into the type of general warrant prohibited by the Fourth Amendment."  (Defendant's Brief at 47). The warrant authorizes the seizure of almost every scrap of paper contained in the residence, and defendant alleges that it offers no probable cause to believe that the items sought could be found at the residence.  The search warrant contains an attachment detailing the property to be seized.  This attachment describes a number of types of property, including "books, records, receipts, notes, ledger" and other items used to record the purchase, transfer and distribution of controlled substance; similar materials describing money laundering activity; similar materials used to record the concealing of assets; indicia of occupancy; weapons, ammunition, or firearms; currency or other things of value that evidence the proceeds of drug trafficking; evidence of drug trafficking activities such as drugs, cutting agents, scales, weights, syringes, pipes, straws, roach clips, rolling papers, sifters, baggies, and other packaging material; computers or data stored on computers that evidences drug trafficking activity; written materials related to the operation of computers; and cell phones, pagers and other communication devices.  (Search

33

Warrant (Doc. 84), Attachment B).

The Fourth Amendment provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons to be seized."  The Amendment thus prohibits a "general warrant . . . that authorizes 'a general exploratory rummaging in a person's belongings.'" United States v. Christine, 687 F.2d 749, 752 (3d Cir. 1982) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)).  The Amendment thus requires "all warrants to contain a 'particular description' of the things to be seized." Id.  A warrant is invalid as a "general warrant" when it would "'vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence.'" United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137, 149 (3d Cir. 2002).

The court finds that the warrant is not a general warrant.  The application for the warrant describes in detail drug transactions that took place in defendant's residence and contains allegations from witnesses that defendant operated a major drug distribution business from those premises.  The items sought in the affidavit are all items related to a drug distribution business, including business records related to defendant's alleged operation.  Moreover, on those items which were not obviously part of the drug trade, the affidavit contains statements by Task Force Officer Harding explaining why such items were sought in the warrant.  As an agent with

34

years of experience in investigating drug trafficking cases, Harding alleges in his

affidavit that drug dealers often hide assets in the hands of other persons and

entities, even though they continue to enjoy use of those assets.  (Affidavit at ¶ 14).

Further, traffickers also maintain large amounts of currency and other assets to

finance their business.  (Id.).  These financial dealings, Harding maintains, are often

recorded in "computerized or written books, records, receipts, diaries, notes, ledgers,

airline tickets, cashier's checks, money orders, and other papers relating to the

transportation, ordering, sale and distribution of controlled substances," and the

debts owed to those who finance such activity and conduct sales for the trafficker.

(Id.).  Thus, the affidavit provides probable cause to believe that even those items

which seem most far afield from a drug operation–such as computer devices–could

be involved in the trade and thus should be seized as evidence.  The warrant

describes in detail papers and devices that could be used to carry out the major drug

trafficking enterprise alleged against the defendant, and the search warrant limits

seizure to items connected to defendant's alleged drug activities as described in the

warrant affidavit.

    Courts have found such warrants sufficient, holding that "[i]t is reasonable to

infer that a person involved in drug dealing on [a large] scale would store evidence of

that dealing at his home."  United States v. Hodge, 246 F.3d 301, 306 (3d Cir. 2001);

United States v. Whitner, 219 F.3d 289, 298 (3d Cir. 2000) (noting that "a [drug]

dealer logically could conclude that his residence is the best, and probably the only,

location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold."). The court will therefore deny the defendant's motion on these grounds.

Defendant also appears to argue that the warrant is overbroad. An overbroad warrant offers both specific and generic descriptions of property, and "authorizes the seizure of items as to which there is no probable cause." Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d at 149. Thus, "[t]he Fourth Amendment dictates that a magistrate may not issue a warrant authorizing a search and seizure which exceeds the ambit of the probable cause showing made to him." Christine, 687 F.2d at 753. In such cases, the Third Circuit has concluded that "redaction" is the proper remedy, meaning that only that portion of the evidence which has been illegally seized should be excluded. Thus, "evidence seized without valid authorization supported by particularized probable cause" should be "suppressed." Id. at 768. In his brief, however, defendant does not point to any particular area of the warrant not supported by probable cause, except to argue that any book or paper in the apartment could have been seized. Paragraph 11 of the attachment to the search warrant describing the materials to be seized names "[a]ny and all written or printed materials which provides [sic] instructions or examples concerning the operation of a computer system, computer software, and/or any related device." The court might be inclined to find this portion

36

of the warrant unsupported in the affidavit.  Defendant does not point to any

evidence, however, that was seized pursuant to this part of the warrant, so his

complaint, if any, about that portion of the warrant is immaterial.

In sum, then, the court finds that the affidavit provided the magistrate judge

with a substantial basis for concluding that probable cause to issue the search

warrant existed.  The court will therefore deny the motion to suppress the evidence

seized pursuant to the warrant.

## D.  Disclosure of Grand Jury Transcripts

Defendant seeks disclosure of the grand jury transcripts in his case (Doc. 54).

He contends that numerous individuals have appeared before the grand jury, many

of whom have not been indicted but were percipient witnesses of the acts and

events underlying the indictment in this case.  He argues that he should be provided

with transcripts of the testimony of the witnesses against him in the grand jury in

order to prepare effectively for trial.

The decision to reveal grand jury transcripts is committed to the discretion of

the trial judge.  United States v. Bryne, 422 F. Supp. 147 (E.D. Pa. 1976) *aff'd in part*

*and rev'd in part* 560 F.2d 601 (3d Cir. 1977).  The Jencks Act requires the

government to disclose prior recorded statements of its witnesses, when related to

the subject matter of their testimony, after each witness testifies on direct

examination.  See 18 U.S.C.  §3500(b).  To the extent that such transcripts are

controlled by the Jencks Act, the Court may not order disclosure of them prior to the

statutory timetable.[4]

Parties seeking grand jury transcripts under Federal Rule of Criminal Procedure 6(e) must show that the material they seek is needed to avoid possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is so structured to cover only material so needed.  Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 222 (1979).[5]  The defendant has not demonstrated that the material he seeks is needed to avoid a possible injustice, nor has the defendant limited his request to cover only necessary material.  The defendant simply has made a broad assertion that the Grand Jury transcripts are needed for the preparation of his defense.  The reasons for Grand Jury secrecy are as follows:

> 1) to prevent the escape of those whose indictment may be contemplated; 2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; 3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; 4) to encourage free and untrammeled disclosures by

---

[4]"No statement or report in the possession of the United States which was made by a government witness or prospective government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. §3500(a).

[5]Federal Rule of Criminal Procedure 6(E) states in pertinent part;

(E) The court may authorize disclosure--at a time, in a manner, and subject to any other conditions that it directs--of a grand-jury matter:
(i) preliminarily to or in connection with a judicial proceeding;
(ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.

persons who have information with respect to the commission of crimes; 5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

Douglas Oil, 441 U.S. at 219, n.9 (1979) (citing United States v. Proctor & Gamble Co., 356 U.S. 677, 681-682, n.6 (1958) (quoting United States v. Rose, 215 F.2d 617, 628-629 (3d Cir. 1954)).  The defendant has not demonstrated a need for the transcripts that is greater than the need for continued secrecy nor has he stated a particularized need.  See e.g., United States v. Bortnick, No. 03-Cr-414, 2004 U.S. Dist. WL 3029731 (E.D. Pa. December 30, 2004) (finding that the defendant did not carry his burden of showing a particularized need when he argued that there was false testimony given during Grand Jury hearings); United States v. Acosta, No. 05-20J, 2006 U.S. Dist. Lexis 48261 (W.D. Pa. July 17, 2006) (denying the defendant's motion for grand jury transcripts for failing to state a particularized need when defendant claimed the transcripts contained exculpatory materials); United States v. Waskey, N0. 98-189, 1998 U.S. Dist. WL 474128 (E.D. Pa. July 21, 1998) ("Grand Jury deliberation should not be opened solely for discovery purposes.") (citing City of Philadelphia v. Westinghouse Electric Corp., 210 F. Supp. 486, 490 (E.D. Pa. 1962)).  The need for "free and untrammeled disclosures by persons who have information with respect to the commission of crimes" is great.  Douglas Oil, 441 U.S. at 219 n.9 (citing United States v. Proctor & Gamble Co., 356 U.S. 677, 681-682, n.6 (1958) (quoting United States v. Rose, 215 F.2d 617, 628-629 (CA3 1954)).

Because defendant has not pointed to any of these specific reasons for the discovery of grand jury transcripts, the court will deny the motion.

### E.  Production of Witness Statements (Jencks material)

Defendant seeks disclosure of the materials to which he is entitled under the Jencks Act, 18 U.S.C. § 3500, at least one week prior to trial (Doc. 48). The government responds that it has allowed defense counsel to review witness statements and promises to provide the defendant with Jencks materials at least three days before the witness testifies at trial.  The dispute here, then, is not over whether or which material the government has an obligation to disclose under the Jencks Act, but instead when the government should be compelled to disclose that information.[6]

---

[6]The <u>Jencks</u> Act provides in part that:
   (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
   (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use. . . .

   (e) The term "statement," as used in subsections (b),(c), and (d) of this section in relation to any witness called by the United States, means–
      (1) a written statement made by said witness and signed by or otherwise adopted or approved by him;
      (2) a stenographic, mechanical, electrical, or other recording, or a

The court will deny this motion as well.  The Third Circuit Court of Appeals has noted that "[t]he blunt command of the [Jencks Act] together with the unequivocal legislative history has led to unbroken precedent in the Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until conclusion of the direct examination at trial."  United States v. Murphy, 569 F.2d 771, 773 (3d Cir. 1978).  At the same time, the court has found "salutary" the government's practice of providing defense counsel with Jencks material "sufficiently in advance of the conclusion of direct examination to obviate trial interruptions solely to permit defense counsel to study the disclosures."  Id. at n.5.  The government, therefore, may be encouraged to provide such information to the defendant before trial, but has no obligation to do so.  Here, the government has agreed to provide defendant with the relevant material three days before trial, exceeding its obligation under the statute.  The court will therefore deny the motion for early production of such material.

### F.  Disclosure of Bad Act Information and Prior Conviction Information

The defendant seeks disclosure of any evidence of other crimes that the government intends to introduce at trial pursuant to Federal Rule of Evidence 404(b) and 609 (Doc. 47).  The government represents that it has submitted to defendant

---

transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.  18 U.S.C. § 3500.

information about crimes involving the corruption of minors to the defendant, but represents that such crimes were part of the larger scheme for which defendant was charged.  (T. at 8). In light of the government's representations, the court will deny this motion as moot.

### G.  Discovery and Inspection

Defendant seeks various items in discovery (Docs. 28, 52).  The government represents that it has provided all materials to which defendant is entitled under Federal Rule of Criminal Procedure 16, and the defendant has not denied this claim. (T. at 8).  As the government has met its discovery obligations, the motion will be denied as moot.

### H.  Expert Information

The government informs the court that it may offer expert testimony to prove that drugs seized during the investigation of the case are controlled substances. (Id.). The defendant seeks a written summary of any expert opinions that the government intends to use at trial.  (Doc. 27).  These expert reports, the government informs the court, have been made available to the defendant.  (T. at 8). The court will therefore deny the motion as moot.

### I.  Motion to Preserve Evidence and Recordings of Interviews

Defendant seeks an order that the government preserve all notes, evidence, reports and taped interviews surrounding the case (Doc. 59).  The government informs the court that no tape recordings of witness interviews exist or were made.

(T. at 9). That part of the motion will be denied as moot.  The government also reports that agents have kept and maintained copies of their reports.  (Id.).  The court assumes that the government will fulfill its discovery obligations in relation to this material, though it will preserve the defendant's opportunity to challenge any failings in this area.  The court will therefore deny that portion of the motion without prejudice to the defendant raising it again at the appropriate time.

### J.  Motion to Identify Evidence

As part of his initial discovery requests, defendant also seeks to have the government identify the evidence that it intends to use at trial to allow him to move to suppress that evidence (See Doc. 28).  The government reports that it has identified all such evidence and defendant has filed motions related to that evidence, which the court disposes of here.  (T. at 9).  Indeed, the suppression hearing conducted by the court utilized that evidence.  As a result, the court will deny the motion as moot.

### K.  Request for Notice of Hearsay Information

Defendant seeks information from the government about any hearsay evidence that it intends to present pursuant to the residual hearsay exception contained in Federal Rule of Evidence 807 (See Doc. 28).  The government contends that it does not seek to offer any such evidence, but will inform defendant if it identifies any such information that it intends to offer.  (T. at 9).  The court will therefore deny the motion as moot.

### L.  Pre-Trial Hearing to Determine the Sufficiency of Government's Proof

**that Defendant was Part of a Conspiracy**

Defendant filed a motion for a hearing to determine the sufficiency of the government's proof that defendant was part of a conspiracy (Doc. 55).  At the hearing on defendant's motion to suppress his statements, the United States Attorney represented to the court that he had advised the defendant's attorney that one of defendant's alleged coconspirators would be called early in the trial by the government as a witness.  (T. at 9).  The United States Attorney offered the undisputed assessment that a hearing on the sufficiency of proof for the conspiracy charges was therefore unnecessary.  (Id.).  Since the defendant did not object to this characterization, the court will consider the issue resolved and deny the defendant's motion as moot.

**M.  Motion to Preserve Investigators' Notes and Evidence**

Defendant seeks an order from the court directing FBI investigators to preserve their rough notes, reports and evidence (Doc. 60).  The government represents that such information is routinely preserved, and that such preservation has occurred in this case.  (T. at 8).   Accordingly, the motion will be denied as moot.

**N.  Individual Voire Dire**

The defendant seeks an order from the court directing that individual voire dire of potential jurors occur in an attempt to determine whether they exhibit a racial bias that would prejudice their opinions (Doc. 62).  While the court recognizes the importance of addressing such potential prejudice, the court also finds that this issue

is raised prematurely.  The issue would be best raised at the time of trial.  The court will therefore deny the motion without prejudice to the defendant raising it at a more appropriate time.

### O.  Bill of Particulars

Defendant also seeks a bill of particulars in the case (Doc. 45).  "The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." United States v. Addonizio, 451 F.2d 49, 63-64 (3d Cir. 1971) (quoting United States v. Tucker, 262 F. Supp. 305, 308 (S.D. N.Y. 1966).  Federal Rule of Criminal Procedure 7(f) allows a court to direct the filing of a bill of particulars.  In determining whether to grant a bill of particulars, a trial court must strike a "prudent balance" between the defendant's interests in securing information and the government's interests in not committing itself to facts before it is in a position to do so.  United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989).  "A bill of particulars is not intended to provide the defendant with the fruit of the government's investigation, but is instead intended to provide the defendant with the minimum amount of information necessary to permit the defendant to conduct his own defense." United States v. Serafini, 7 F. Supp. 2d 529, 547 (M.D. Pa. 1998) (citing United States v. Smith, 776 F.2d 1104 (3d Cir. 1985) (emphasis in original). "In ascertaining whether a bill of particulars is appropriate, the court may consider not

only the indictment, but also all the information that has been made available to the defendant." United States v. Fischbach & Moore, Inc., 576 F. Supp. 1384, 1389 (W.D. Pa. 1989) (citing United States v. Kenny, 462 F.2d 1205, 1212 (3d Cir. 1972), *cert denied*, 409 U.S. 914 (1972); United States v. Bloom, 78 F.R.D. 591, 600-601 (E.D. Pa. 1977); United States v. Azzarelli Construction Co., 459 F. Supp. 146, 151 (E.D. Ill. 1978), *aff'd*, 612 F.2d 292 (7th Cir. 1979), *cert. denied*, 447 U.S. 920 (1980); United States v. Barrows, 122 F. Supp. 324, 325 (D. Del. 1954).

Defendant here argues that the indictment is not sufficiently specific as to the time, place and individuals involved in the alleged conspiracy with which defendant is charged to allow him to defend himself.  The grand jury's eight-count superseding indictment, handed down on March 18, 2006, charged the defendant with the unlawful distribution of marijuana and cocaine, use of a building as part of a drug distribution enterprise, unlawful possession of firearms, unlawful possession of firearms while being a drug user, and with conspiracy to distribute crack, cocaine and marijuana.  (See Doc. 33). The indictment provides specific dates for the counts of drug distribution and possession of firearms, and provides the dates on which the conspiracy and the use of the home offenses took place.

The court concludes that this indictment and the discovery which the government has provided–which includes the names of confidential informants and other information concerning the results of its investigation–have provided the defendant with the information necessary to understand the charges against him and

to mount a defense in this case.  The indictment establishes the time, date and

general location where the alleged conspiracy took place, as well as the object of

that conspiracy.  While the indictment lacks the names of other parties to the

conspiracy, defendant need not know those names in order to defend himself

against such charges.  The government has thus provided at least the minimum of

amount of information necessary; ordering the government to provide more

information would improperly expose the fruits of the investigation.  The motion for a

bill of particulars will be denied.

###### P.  Sentencing Enhancement Information

Defendant also seeks information from the government on any factors that

may enhance a sentence he could receive (Doc. 53).  The government avers that

such an order would be improper, but that it has discussed sentencing

enhancements with the defendant.  (T. at 10-11).   As such, the government insists

that such an order is unnecessary.   (Id.).  The court finds that Rule 16 does not

compel the discovery of such information, and the court will thus deny the motion.

See FED. R. CRIM P. 16.

###### Q.  Disclosure of Confidential Informants

Defendant seeks the disclosure of the identities of two confidential informants

used by the government during the investigation of the case (Doc. 46).  The

government represents to the court that the identities of those informants have been

provided to the defendant.  (T. at 11).  Accordingly, the motion will be denied as

moot.

> **R.  Motion for Hearing on Authenticity and Audibility of Tape Recordings and the Accuracy of Transcripts**

Defendant seeks the court to order a hearing to examine whether recordings which the government may use in this case are audible and any transcripts of those recordings supplied by the government are accurate (Doc. 56).  At the hearing on defendant's motion to suppress his statements, defense counsel represented that he had not yet received copies of transcripts of the recordings, but had been promised he would receive them.  (T. at 6).  Defense counsel agreed that the motion would be best addressed after he had an opportunity to examine the transcripts and determine whether they were useful.  (Id.).  As such, the court will therefore deny the motion without prejudice to the defendant raising the issue again at an appropriate time.

**Conclusion**

For the reasons stated above, the court will deny all the defendants' pre-trial and discovery motions except defendant's motion for leave to file additional pretrial motions.[7]  An appropriate order follows.

---

[7]The government offers no response to defendant's motion for leave to file additional pre-trial motions.  (Doc. 61).  The court therefore concludes that the government does not oppose it, and will grant the motion.  The court notes, however, that defendant would–even without such an order from the court–have leave to file a legitimate motion at any time before trial.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 3:07cr394** |
| | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **FRANK CAPLE,** | : | |
| **Defendant** | : | |

**ORDER**

**AND NOW**, to wit, this 8th day of December 2008, it is hereby **ORDERED** as follows:

1) Defendant's motion to suppress statements made as a result of a consensual body wire recording (Doc. 80) is hereby **DENIED**;

2) Defendant's motion to suppress statements (Doc. 57) is hereby **DENIED**;

3) Defendant's motion to suppress physical evidence (Doc. 58) is hereby **DENIED**;

4) Defendant's motion for a bill of particulars (Doc. 45) is hereby **DENIED**;

5) Defendant's motion for a hearing pursuant to <u>United States v. Starks</u> (Doc. 56) is hereby **DENIED** without prejudice to re-filing at a more appropriate time;

6) Defendant's motion for a hearing to determine the existence of a conspiracy (Doc. 55) is hereby **DENIED**;

7) Defendant's motion to produce and preserve notes, tapes and evidence

(Doc. 60) is hereby **DENIED** as moot;

8) Defendant's motion to compel government to provide 404(b) and 609 information (Doc. 47) is hereby **DENIED** as moot;

9) Defendant's motion to compel disclosure of confidential informants (Doc. 46) is hereby **DENIED** as moot;

10) Defendant's motion for individual voire dire (Doc. 62) is hereby **DENIED** without prejudice to re-filing at an appropriate time;

11) Defendant's motions for discovery pursuant to Federal Rule of Criminal Procedure 16 (Docs. 27, 52) are hereby **DENIED** as moot;

12) Defendant's motion for leave to file additional pre-trial motions (Doc. 61) is hereby **GRANTED**

13) Defendant's motion for disclosure of sentencing information (Doc. 53) is hereby **DENIED**;

14) Defendant's motion to produce and preserve tapes of police interviews (Doc. 59) is hereby **DENIED** as moot;

15) Defendant's motion for disclosure of Jencks material (Doc. 48) is hereby **DENIED** with respect to defendant's request to have Jencks material produced seven days before introduction at trial and **DENIED** without prejudice to re-filing the motion at an appropriate time with respect to the material itself; and

16) Defendant's motion for production of grand jury transcripts (Doc. 54) is

50

hereby **DENIED**.

**BY THE COURT:**


s/ James M. Munley
**JUDGE JAMES M. MUNLEY
UNITED STATES DISTRICT COURT**